UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DUSTIN GRANGER,<br><br>*Plaintiff*,<br><br>v.<br><br>ANTONIO SANTIAGO, GARETH TOSSES, DAVID EVANS, JEFFREY CONGER, and ANGEL QUIROS,<br><br>*Defendants*. | No. 3:19-cv-60 (MPS) |

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Dustin Granger, who was a pretrial detainee at Corrigan-Radgowski Correctional Center at the relevant time, filed suit against Connecticut Department of Correction ("DOC") employees Jeffrey Conger, David Evans, Angel Quiros, Antonio Santiago, and Gareth Tosses. Granger alleges that defendants Conger, Evans, Santiago, and Tosses violated his rights under the Fourth, Eighth and/or Fourteenth Amendments in violation of 42 U.S.C. § 1983, that defendants Conger and Santiago violated his rights under the First Amendment, and that defendants Evans, Conger, and Tosses committed assault and battery in violation of Connecticut common law. The relief he seeks includes a permanent injunction preventing defendant Quiros, the DOC Commissioner, from using Conn. Gen. Stat. §§ 18-85a or -85b, which permit the State to recover incarceration costs from damages awards obtained by inmates, to encumber any judgment Granger may recover in this case, as well as a declaratory judgment that use of the Connecticut statutes in this manner is preempted by § 1983. Santiago now moves for summary judgment on Granger's Fourth and Fourteenth Amendment claims, and Santiago and Conger move for summary judgment on Granger's First Amendment claim. In addition, defendant

1

Quiros asserts that Granger's claim for injunctive relief is not ripe.  For the reasons set forth below, the defendants' motion for summary judgment is GRANTED as to the Fourth and Fourteenth Amendment claims against Santiago and DENIED in all other respects.

I. **Factual Background**

The following facts, which are taken from the parties' Local Rule 56(a) statements and supporting exhibits, are undisputed unless otherwise indicated.

A. <u>August 26, 2016 Shower Room Incident</u>

On August 26, 2016, Granger entered the custody of the DOC as a pretrial detainee and was admitted to the Corrigan-Radgowski Correctional Center ("Corrigan").  ECF No. 73-2 at ¶ 2; ECF No. 91 at Section I, ¶ 2.  On the day Granger entered DOC custody, Evans was a Correction Officer at Corrigan, Conger and Tosses were Lieutenants at Corrigan, and defendant Santiago was the warden of the facility.  ECF No. 73-2 at ¶ 6; ECF No. 91 at Section I, ¶ 6.

Pursuant to DOC policy, Granger—as a newly admitted inmate—was required to undergo a strip search upon his admission to Corrigan.  ECF No. 73-2 at ¶ 3; ECF No. 91 at Section I, ¶ 3.  The relevant DOC Administrative Directive defines a strip search as a "visual body cavity search which includes a systematic visual inspection of an unclothed person's hair, body cavities (to include the individual's ears, nose, mouth, under arms, soles of the feet and between the toes, rectum and genitalia.  This search shall also include a physical search of the clothing and any personal effects."  ECF No. 73-2 at ¶ 4; ECF No. 91 at Section I, ¶ 4.  At Corrigan in August of 2016, strip searches of newly admitted inmates like Granger were normally conducted in the shower area of the Admitting and Processing ("AP") area of the Corrigan building.  ECF No. 73-2 at ¶ 5; ECF No. 91 at Section I, ¶ 5.

As part of Granger's admission process, Evans brought him to Corrigan's AP shower area for Granger to undergo a strip search. Once in the AP shower area, Evans instructed Granger to remove his clothing, and Granger did so. ECF No. 73-2 at ¶¶ 7-8; ECF No. 91 at Section I, ¶¶ 7-8. Granger also told Evans that he had swallowed drugs the night before, and he asked to be placed in a "dry cell."[1] ECF No. 73-2 at ¶¶ 9-10; ECF No. 91 at Section I, ¶¶ 9-10. Evans told Granger that he still had to submit to a strip search and that he would have to wait. *Id.* Evans then ordered Granger to "squat and cough" and then to "[b]end over at the waist and spread [his] cheeks." ECF No. 73-2 at ¶ 12; ECF No. 91 at Section I, ¶ 12. Granger asserts that he complied with the order to "squat and cough" but acknowledges that he refused to comply with the "bend and spread" search. ECF No. 91 at Section I, ¶ 12. According to Granger, he was sexually abused as a child, *id*. at Section II, ¶ 1, and he told Evans that he was not comfortable complying with the "bend and spread" search because "some things ha[d] happened to [him] in the past." *Id*. at Section I, ¶ 16. Granger then asked Evans to call a lieutenant "so he can handle the situation, too, so I can get placed in a dry cell." ECF No. 73-2 at ¶ 14; ECF No. 91 at Section I, ¶ 14. Granger and Evans had some back-and-forth regarding Granger's requests that Evans call a lieutenant and that he be placed in a dry cell and Granger's refusal to submit to the "bend and spread" search. ECF No. 73-2 at ¶ 15-17; ECF No. 91 at Section I, ¶ 15-17.

Eventually, Granger heard Evans make a call over the radio. Then, several other officers arrived in the shower area, grabbed Granger, threw him against the wall, kneed him, handcuffed him, and "took [him] to the ground." ECF No. 73-2 at ¶ 18; ECF No. 91 at Section I, ¶ 18. According to his own deposition testimony, Conger arrived at the AP room after Granger was

---

[1] According to Granger's complaint, a "dry cell" is a "cell without a flushing toilet where a pretrial detainee … can be observed and, after each bowel movement, their feces may be examined for contraband." ECF No. 61 at ¶ 15.

3

handcuffed and on the ground. ECF 90-5 at 28.[2] According to Granger, officers held him down while he was handcuffed, and Tosses inserted his fingers into Granger's rectum and removed at least some of the drugs that Granger had swallowed. ECF No. 91 at Section II, ¶ 19 (mistakenly labeled ¶ 17). Granger asserts that Tosses made comments such as "Who wants to fuck this bitch" and "Now how does that feel bitch!" before and while performing the body cavity search. *Id.* Granger contends that Conger observed this incident from the doorway of the AP shower room. *Id*. at Section I, ¶ 20. (Conger testified at his deposition that he observed from the doorway of the shower room but that Granger, not Tosses or any other officer, removed the drugs. *See* ECF No. 90-5 at 29-30.)

Santiago was not present in the AP shower room, nor did Granger see Santiago at any point on August 26. ECF No. 73-2 at ¶ 19; ECF No. 91 at Section I, ¶ 19.

B. Incident Report

Tosses and Conger communicated over phone and email regarding the drafting of the incident report. ECF No. 91 at Section II, ¶ 24 (mistakenly labeled ¶ 22). Generally, an officer who witnesses an incident involving use of force will write a statement regarding the incident, and that officer's name will be included in the incident report documenting the incident. *Id.*; ECF No. 90-8 at 65-66, 69. Conger's name is not listed in the incident report prepared by Tosses, and he did not prepare his own statement regarding the incident. *Id.*

C. Prior Complaints Regarding Strip Searches and Absence of Cameras in Shower Room

According to Granger, relying upon the deposition testimony of Conger, the DOC had in August 2016 recently begun conducting more intrusive strip searches. These more intrusive searches prompted inmate complaints as well as lawsuits. ECF No. 91 at Section II, ¶ 3. In

---

[2] This ruling cites ECF page numbers throughout.

addition, Granger highlights a lawsuit filed in July 2017 by an inmate alleging that Evans had made sexually derogatory and harassing remarks to that inmate when directing him to comply with the more intrusive "bend and spread" strip search in February 2015. *Id.* at Section II, ¶ 4. Santiago testified that he recalled that this inmate had "had some issues at Corrigan" but that he did not recall what those issues were. *Id.* at Section II, ¶ 5.

Granger also cites a DOC Administrative Directive as evidence that Santiago was responsible for supervising Corrigan and its staff and for ensuring full compliance with the Prison Rape Elimination Act ("PREA") and DOC's own zero-tolerance policy regarding sexual abuse and harassment. ECF No. 91 at Section II, ¶ 6 (mistakenly labeled ¶ 4). That administrative directive provides that upper-level management officials at each prison facility shall review incidents of sexual abuse and make recommendations to minimize potential for future incidents of such abuse, including recommendations regarding installation and use of monitoring technology. ECF No. 90-20 at ¶ 22.

As Warden at Corrigan, Santiago had the authority to install additional cameras where he considered it necessary. ECF No. 91 at Section II, ¶ 7 (mistakenly labeled ¶ 5). Before August 2016, he had directed that two additional cameras be installed in the AP room "because of the high number of incidents that occurred in that area." *Id.* The "incidents" involved inmate fights, attempts by inmates to enter offices, and inmates "[s]liding stuff under the door." ECF No. 90-8 at 132. Santiago had considered placing additional cameras in the AP room but did not end up doing so. ECF No. 91 at Section II, ¶¶ 7-8 (mistakenly labeled ¶ 5-6). On August 26, the AP room had three fixed video cameras, which were centrally monitored. *Id.* at Section II, ¶ 2. Recordings from those cameras were kept for up to 45 days before being recycled. ECF No. 91 at Section II, ¶ 2; ECF No. 90-8 at 140-141. However, the shower room is one area of the AP

Room that is not visible from any of the three fixed cameras. ECF No. 91 at Section II, ¶ 2. Although an officer brought a handheld camera to the AP shower room, the camera was turned on only after the alleged assault on Granger. *Id*. at Section II, ¶ 9 (mistakenly labeled 7).

D. <u>Interactions with Conger and Filing of PREA Complaint</u>

Following the August 26 incident, Granger was placed in a dry cell for two to three days, then moved to Corrigan's Restrictive Housing Unit ("RHU") due to disciplinary reports he received for his actions on August 26. ECF No. 73-2 at ¶ 22; ECF No. 91 at Section I, ¶ 22. At the time, Conger was the unit manager of the RHU. ECF No. 73-2 at ¶ 23; ECF No. 91 at Section I, ¶ 23.

According to Granger, Conger came to the dry cell on August 26, after Granger was placed there. EF No. 91 at Section II, ¶ 23 (mistakenly labeled ¶ 21). At that time, the two had a conversation in which Granger requested a legal call with the Inmates Legal Assistance Program ("ILAP"). *Id.* Conger did not permit Granger to place a legal call, *id.* at ¶ 25 (mistakenly labeled ¶ 23), but told him something along the lines of, "when you get out of here we['re] going to handle this situation." ECF No. 90-1 at 44.

At some point during his stay in the RHU, Granger was brought to the counselor's office in the RHU, where he encountered Conger. Granger asked Conger to place a legal call to ILAP, but Conger refused, saying, "[y]ou are not getting to get no legal call, but I'll give you some type of paperwork if you behave yourself." ECF No. 73-2 at ¶ 26; ECF No. 91 at Section I, ¶ 26. Sometime later that day, Granger was provided the paperwork he needed to initiate a PREA complaint. ECF No. 73-2 at ¶ 27; ECF No. 91 at Section I, ¶ 27.

Conger also testified at his deposition that at some point he and Granger had a conversation in which Conger said something along the lines of "Why are you doing this? I was

6

there. I watched you get the drugs out of your butt.  Why are you saying that the officers did it?" ECF No. 90-5 at 83.  Conger testified that, in having this conversation, he was seeking to understand why Granger was filing a PREA complaint, not to dissuade him from doing so.  *Id.* at 84.

Granger completed the paperwork and gave it to an officer in the RHU.  ECF No. 73-2 at ¶ 28; ECF No. 91 at Section I, ¶ 28.  Granger's complaint was filed on September 2, while he was still housed in the RHU.  An incident report was then generated, and Conger filed it and Granger's written statement up the chain of command to Warden Santiago's office for review for possible recommendation for referral to the PREA unit.  ECF No. 73-2 at ¶ 29; ECF No. 91 at Section I, ¶ 29.  According to Granger, relying on Conger's deposition testimony, Conger obtained the written witness statement from Granger that was included in Granger's PREA complaint.  ECF No. 91 at Section II, ¶ 26 (mistakenly labeled ¶ 24).

According to Granger, he informed Santiago on September 9 while Santiago was touring the RHU that an officer had removed drugs from his anal cavity on August 26.  ECF No. 91 at Section II, ¶ 27 (mistakenly labeled ¶ 25); ECF No. 97-2 at 5.

On September 19, Santiago's office forwarded the complaint up the chain of command to the District Administrator, requesting a review of the complaint for possible referral to the PREA unit.  ECF No. 73-2 at ¶ 31; ECF No. 91 at Section I, ¶ 31.  The next day, the Commissioner directed the PREA Unit to open an investigation into Granger's complaint.  ECF No. 73-2 at ¶ 32; ECF No. 91 at Section I, ¶ 32.

E. <u>Transfer to New Haven Correctional Center</u>

Meanwhile, on September 9, Corrigan's Deputy Warden submitted a request to DOC's Offender Classification and Population Management Unit to have Granger transferred from

Corrigan, which indicated that the reason for the request was the desire to separate Granger from the staff at Corrigan who were the subject of his PREA complaint. ECF No. 73-2 at ¶ 34; ECF No. 91 at Section I, ¶ 34. On September 12, Granger was transferred to New Haven Correctional Center ("NHCC"). ECF No. 73-2 at ¶ 36; ECF No. 91 at Section I, ¶ 36. Granger claims that this transfer was a hardship because it took him "out of his element" and away from his children, girlfriend, and brothers because, although he was allowed to have visitors and place phone calls at NHCC, the facility was too far away for his family to visit him. ECF No. 73-2 at ¶ 37; ECF No. 91 at Section I, ¶ 37 [mistakenly labeled ¶ 31]. Granger was represented at the time by a public defender, and he was able to communicate by telephone with his public defender while at NHCC. ECF No. 73-2 at ¶ 34; ECF No. 91 at Section I, ¶ 34 [mistakenly labeled ¶ 32].

      The defendants assert that it is DOC protocol to separate an inmate from staff against whom he has made sexual misconduct allegations. ECF No. 73-2 at ¶ 33; *see also* ECF No. 90-5 at 96. Granger appears to contest that such a protocol exists (describing it as DOC's "purported" policy in his response brief, ECF No. 89 at 32), and he contends that such a protocol was not the actual motivation for his transfer.[3] The ultimate decision of whether to transfer an inmate, including when and to what facility, is made by the Offender Classification and Management Unit. Neither Conger nor Santiago were members of that unit during the relevant time period. ECF No. 73-2 at ¶¶ 35-36; ECF No. 91 at Section I, ¶¶ 35-36. Conger testified that at some point after Granger filed his PREA complaint but before he was transferred, Santiago asked Conger why Granger's transfer was taking so long. ECF No. 91 at Section II, ¶ 28 (mistakenly labeled ¶ 26).

---

[3] While Granger references deposition testimony of DOC's PREA investigator and other evidence to argue that DOC was not complying with PREA and its own administrative directives when investigating Granger's complaint, none of that evidence bears on the questions of whether DOC had a policy of transferring inmates away from staff against whom they made complaints or whether Santiago and Conger followed such a policy in this case.

## II. Legal Standard

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (internal quotation marks and citations omitted). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

## III. Discussion

### A. Fourth and Fourteenth Amendment Claims Against Defendant Santiago

Santiago moves for summary judgment on Granger's search and excessive force claims arising from the August 26 shower room incident. "A valid § 1983 claim requires a showing of personal involvement by the defendant in the alleged constitutional deprivation." *Atkinson v. N.Y. State Olympic Regional Dev. Auth.*, 822 F. Supp. 2d 182, 190 (N.D.N.Y. 2011). Recently, the Second Circuit held that to "hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official

without relying on a special test for supervisory liability." *Tangreti v. Bachman*, 983 F.3d 609, 620 (2d Cir. 2020).  There is no evidence in the record from which a reasonable juror could infer Santiago's personal involvement in the August 26 incident.  And while Granger points to previous complaints against Evans and the failure to install cameras in the shower area, those actions at most amount to gross negligence, which is insufficient (even assuming that Santiago was aware of the substance of the complaints against Evans) to support a constitutional violation by a supervisory official under *Tangreti*.  *Id.* at 620 ("[I]t is not enough for [the plaintiff] to show that [the defendant] was negligent, or even grossly negligent, in her supervision of the correctional officers or in failing to act on the information she had.").  Further, there is no evidence that Santiago was aware that there were previous complaints about sexually abusive conduct by Evans or that there were previous incidents of sexual abuse or even misconduct by staff in the shower area, as opposed to fights between inmates and other inmate misconduct.  The absence of such evidence suggests that Granger could not have prevailed even under a gross negligence standard.

In addition, Granger suggests that Santiago may be held liable based on his failure to intervene to protect Granger's rights from being violated by the officers who Granger claims used excessive force and engaged in an unreasonable search.  I disagree.  While it is "widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence," *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994), there is no evidence in the record from which a reasonable juror could infer that Santiago was present at any point during the August 26 incident.  He had no "realistic opportunity to intervene to prevent the harm from occurring." *Id.  See also Sloley v. VanBramer*, 945 F.3d 30, 46-47 (2d Cir. 2019) (affirming

district court's dismissal of claims against defendant who was unaware that fellow officer was going to conduct a visual body cavity search).

Finally, while Granger cites authority such as *Farmer v. Brennan*, 511 U.S. 825 (1994), which held that prison officials may be liable under the Eight Amendment for failure to protect an inmate from other inmates if the officials know or recklessly disregard that the inmate faces a substantial risk of serious harm and fail to take reasonable measures to abate the risk, no Eighth Amendment—nor Fourteenth Amendment—deliberate indifference claims were pled in this case.  Granger's complaint alleges violations of his rights against unreasonable searches and the use of excessive force, ECF No. 61 at 13-15, and he has not presented any evidence from which a reasonable juror could conclude that Santiago violated those rights.  As a result, I grant summary judgment to Santiago on Granger's search and excessive force claims.

B.  First Amendment Claims

Granger also alleges that Santiago and Conger violated his First Amendment rights by retaliating against him for attempting to report the August 26 incident.  To establish a First Amendment retaliation claim, a plaintiff must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)).  To be adverse, an action must be one that would deter a "similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Brandon*, 938 F.3d at 40.  "The test is objective, and the plaintiff is not required to show that he was actually deterred." *Id.* Nonetheless, because retaliation claims brought by prison inmates are easily fabricated, the courts consider such claims with skepticism and require that they be supported by specific facts.

11

Conclusory allegations of retaliatory conduct are not sufficient. *See Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (First Amendment retaliation claims brought by prisoners must be "supported by specific and detailed factual allegations, not stated in wholly conclusory terms.") (internal citation and quotation marks omitted).

    a. <u>Retaliation Claim Against Santiago</u>

Granger argues that he engaged in protected conduct when he reported what occurred on August 26. The parties have presented evidence that Granger's PREA complaint was forwarded to Santiago's office on September 2 and that Granger told Santiago about the underlying incident on September 9. A reasonable juror could conclude based on this evidence that Santiago was aware of Granger's PREA complaint. Filing of a PREA complaint is protected activity, for the same reason that filing of prison grievances constitutes protected activity. *See Brandon*, 938 F.3d at 40 (filing of prison grievances is a protected activity). The defendants do not appear to contest this point. Thus, Granger has satisfied the first prong of the retaliation test.

With respect to the second prong, adverse action, Granger presents no evidence from which a reasonable juror could conclude that Santiago was aware of Conger's denial of Granger's requests for legal calls or Conger's asking Granger why he was filing a PREA complaint. Thus, the sole basis for Granger's claim that Santiago retaliated against him for the filing of his PREA complaint is Santiago's alleged involvement in Granger's transfer to NHCC. While "[a] prisoner has no liberty interest in remaining at a particular correctional facility," prison authorities "may not transfer an inmate in retaliation for the exercise of constitutionally protected rights." *Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir. 1998). And while several district courts within this Circuit have held that transfer of an inmate from one correctional facility to another is not—absent aggravating circumstances such as more restrictive conditions at the

transferee facility—adverse action, *see, e.g.*, *Jusino v. Gallagher*, No. 21-cv-689 (SRU), 2021 WL 3726010, at *5 (D. Conn. Aug. 23, 2021), the Second Circuit has never endorsed this view and has, at least in one unpublished decision, rejected it. *See Smith v. Levine*, 510 Fed. Appx. 17, 21 (2d Cir. 2013) ("Defendants contend that, because the conditions at [the facility to which the plaintiff was transferred] were not appreciably worse than at [the original facility], the transfer was not an adverse action. This claim finds no support in the relevant case law.") In any event, while Granger has not presented evidence that the conditions at NHCC were more restrictive than those at Corrigan, he testified at his deposition that the transfer took him farther away from his family and, as a result, made it more difficult for his family to visit him. Drawing all reasonable inferences in favor of Granger, I conclude that a reasonable juror could find that such a transfer would deter an inmate of ordinary firmness from pursuing his First Amendment rights and that it was, therefore, adverse action.

Further, Granger has also presented evidence from which a reasonable juror could conclude that Santiago was involved in the decision to transfer Granger. While Santiago was not a member of the Offender Classification Management Unit and therefore could not make the ultimate decision to transfer Granger, that does not mean that Santiago could not request such a transfer. It is undisputed that the Deputy Warden of Corrigan entered the request that Granger be transferred. The Deputy Warden was under Santiago's supervision and, given that Santiago inquired of Conger why Granger had not yet been transferred, a reasonable juror could infer that Santiago was involved in the decision to submit the request.

Granger has also presented evidence of a causal connection between the protected conduct and the transfer. "Once an adverse action is adequately shown, a plaintiff must still introduce evidence sufficient to support the inference that the speech played a substantial part in

13

the adverse action. That is, a plaintiff must establish a causal connection between the defendants' actions and the adverse action." *Brandon*, 938 F.3d at 40 (internal citations and quotation marks omitted). Mere negligence is not sufficient. Rather, "[a] plaintiff must show some evidence of retaliatory intent to cause the adverse effect." *Id.* "One way a plaintiff can establish a causal connection is by showing that protected activity was close in time to the adverse action." *Id.* (quoting *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009)). The Second Circuit has declined to draw a bright line as to how close in time the events must be, instead calling on courts to exercise "judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Brandon*, 938 F.3d at 40 (2d Cir. 2019). Here, Granger was transferred ten days after initially filing his PREA complaint and only three days after he spoke to Santiago about the incident underlying the complaint. An inference that the two events were causally connected is permissible in light of this temporal proximity.

The defendants do not argue that the two events were not causally connected. They acknowledge that Granger was transferred because he filed a PREA complaint but assert that the motive for the transfer was the permissible desire to separate Granger from the staff members named in his PREA complaint, rather than impermissible retaliatory intent. The only evidence the defendants present to show the existence of such a policy is testimony from Santiago and Conger; they point to no administrative directives, internal memoranda, or other policy documents to substantiate their claim that DOC has such a policy and/or consistently follows it. A reasonable reasonable juror could decide not to credit Granger's and Santiago's testimony on this point and could instead infer from evidence presented by Granger that he was transferred because the defendants wished to retaliate against him for filing the complaint.[4] The defendants

---

[4] The defendants also argue in a footnote that it is difficult to establish retaliatory intent by an officer when the protected speech did not target that officer. But the Second Circuit authority the defendants cite is distinguishable

have failed to eliminate a triable issue of fact on the question of whether "they would have [transferred] [Granger] even in the absence of the protected conduct." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).

Because I conclude that a reasonable juror could find that Santiago played a role in Granger's transfer and that the decision to transfer Granger was motivated by the impermissible desire to retaliate against Granger for engaging in protected conduct, I deny Santiago's motion for summary judgment as to Granger's First Amendment retaliation claim.

### b. Retaliation Claim Against Conger

Granger claims that Conger retaliated against him for his protected conduct by denying him two legal calls, threatening him, and playing a role in his transfer to NHCC. Denial of two legal calls does not constitute adverse action because an inmate of ordinary firmness would not be deterred by the denial of two legal calls. *Hunnicutt v. Kitt*, No. 3:10-CV-657 (CSH), 2012 WL 1247268, *8 (D. Conn. Apr. 13, 2012) ("the fact that the plaintiff's legal books and papers were taken and returned the next day, that correctional supervisors allegedly failed to properly investigate the plaintiff's claims, pick up a commissary order form one day, and provide two legal calls, and that the plaintiff underwent a duplicative and allegedly improper pat search would not deter an inmate of ordinary resolve from complaining about staff conduct"). Likewise, Conger's questioning of Granger regarding why he was filing a PREA complaint, even if interpreted as an attempt to intimidate Granger into abandoning his complaint, does not constitute adverse action. *Hayes v. Dahlke*, 976 F.3d 259, 274 (2d Cir. Feb. 27, 2020)

---

from this case. In *Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009), the Second Circuit held that the plaintiff had failed to establish retaliatory intent in part because the protected speech (a letter sent to a local prosecutor) not only named none of the defendants but named no officers at all. And in *Espinal,* the Second Circuit held that the plaintiff had introduced sufficient evidence of retaliatory intent among defendant officers, where only one was named in the plaintiff's prior lawsuit (the protected conduct in that case). 558 F.3d 119 at 129-130.

(defendant's comment that "maybe all of this would go away" if inmate stopped filing grievances, combined with refusal to file inmate's grievance for a month, did not constitute adverse action); *Bartley v. Collins*, 2006 WL 1289256, *6 (S.D.N.Y. May 10, 2006) ("[V]erbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action.").

Because the denial of phone calls and potential effort to intimidate do not rise to the level of adverse action, Granger can only make out a retaliation claim against Conger by showing that Conger had some involvement in his transfer to NHCC. Granger has presented evidence that Santiago discussed Granger's transfer with Conger and that a counselor in the RHU, which Conger supervised, "would [have] put [Granger's] name on the list" of inmates to be transferred. ECF No. 90-5 at 119:17-18. This evidence is sufficient to create a genuine issue of material fact as to whether Conger was involved in the transfer decision. And as I explain above, Granger has presented evidence from which a reasonable juror could conclude that Granger engaged in protected conduct, that he was transferred to NHCC in retaliation for engaging in that conduct, and that the transfer was adverse action. Because I conclude that a reasonable juror could find that Conger played a role in Granger's transfer and that the decision to transfer Conger was motivated by the impermissible desire to retaliate against Granger for engaging in protected conduct, I deny Conger's motion for summary judgment as to Granger's First Amendment retaliation claim.

    c. Qualified Immunity

Both Santiago and Conger argue that I should grant them summary judgment on Granger's retaliation claims because they are entitled to qualified immunity. I disagree. Qualified immunity attaches when an official's conduct "does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Although there need not be "a case directly on point" before a right is clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 12 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017) (internal citations and quotation marks omitted). The Supreme Court has cautioned that "clearly established law should not be defined at a high level of generality." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal citations and quotation marks omitted). Rather, clearly established law "must be particularized to the facts of the case." *Id*.

While the defendants contend that they acted reasonably and took no actions with the intent to retaliate against Granger, this contention rests on their version of the facts. As discussed above, Granger has introduced evidence from which a reasonable juror could infer that he was transferred in retaliation for engaging in protected conduct. Even though the defendants have presented evidence, in the form of their own testimony, that Granger was transferred because of a well-intentioned DOC policy that seeks to separate inmates from staff members against whom they have filed PREA complaints, whether to credit that testimony is a question for the jury. And if a juror were to conclude that Granger was transferred not to separate him from the officers he claimed attacked him but instead to retaliate against him for filing a PREA complaint, the defendants would not be entitled to qualified immunity because the right not to be transferred in retaliation for engaging in constitutionally protected conduct was well established when Granger was transferred in September 2016. *See, Davis*, 160 F.3d at 920; *Smith*, 510 Fed. Appx. at 21 (vacating district court's finding of qualified immunity on ground that it was clearly

established that prison transfer could constitute adverse action needed to support inmate's First Amendment claim: "We had stated, at least as early as 1998, that while '[a] prisoner has no liberty interest in remaining at a particular correctional facility,' prison authorities 'may not transfer an inmate in retaliation for the exercise of constitutionally protected rights.'") (quoting *Davis*, 160 F.3d at 920).

Thus, because there are disputed facts regarding the reason why Granger was transferred (as well as the extent to which both Santiago and Conger were involved in the decision to transfer him), I cannot conclude at this stage that Santiago and Conger are entitled to qualified immunity on Granger's retaliation claim.

C.  Connecticut's Incarceration Lien Statute

The relief Granger seeks in this case includes a permanent injunction against defendant Quiros and his subordinates preventing them from using Conn. Gen. Stat. §§ 18-85a or -85b to impose a lien against any judgment Granger may recover in this case to defray the costs of his incarceration, as well as a declaratory judgment that use of the Connecticut statutes in this manner would violate § 1983.  Quiros asserts that this request for relief is not ripe.  I agree that this request is not ripe for resolution at this stage of the case, as no judgment has been awarded.  But I disagree that dismissing this request for relief at this stage is appropriate.  As a result, Quiros's motion is DENIED without prejudice to his raising the issue again at a later stage.

## IV. Conclusion

Defendants' motion for summary judgment (ECF No. 73) is GRANTED as to the unlawful search and excessive force claims against Santiago and DENIED in all other respects. IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated:	Hartford, Connecticut
	September 10, 2021